NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WEST ORANGE BOARD OF EDUCATION,<br><br>Plaintiff<br>v.<br>B.R. and L.R. o/b/o B.R. and G.R.,<br><br>Defendants. | Civil Action No.: 21-13849<br><br>**OPINION** |

**CECCHI, District Judge.**

**I.   INTRODUCTION**

This matter comes before the Court on West Orange Board of Education's ("Plaintiff" or the "Board") motion for summary judgment (ECF No. 11) pursuant to Fed. R. Civ. P. 56. The Board seeks review of the Administrative Law Judge Thomas R. Betancourt's ("ALJ") June 16, 2021 final decisions granting emergent relief to R.R.[1] and L.R. ("Defendants" or the "Parents") on behalf of B.R. and G.R. respectively, pursuant to the Individuals with Disabilities Act, 20 U.S.C. §§ 1400 et seq. ("IDEA"). The Board asks this Court to reverse the ALJ's June 16, 2021 Order establishing new placements pending the outcome of due process petitions. ECF No. 11-4 ("Pl. Br.") at 4, 32. The Parents opposed the Board's motion (ECF No. 13, "Def. Br."), and the Board replied (ECF No. 14, "Pl. Reply"). The Court decides this matter without oral argument pursuant to Fed. R. Civ. P. 78(b). For the reasons stated below, the Court denies Plaintiff's motion for summary judgment.

---

[1] Although the Complaint refers to the Parents as B.R. and L.R. (ECF No. 1), the ALJ's decisions (ECF No. 11-6 Ex. B, Ex. F) and the Parents' submission (ECF No. 13) indicates the Parents' initials are R.R. and L.R.

II.     **BACKGROUND**

    a.  **Factual Background**[2]

G.R. and B.R., siblings, are classified students eligible for special education and related services who currently reside in West Orange, New Jersey, within the area served by the Board. Pl. SMF at ¶¶ 1-2. Their Parents relocated them from their previous residence in New York City to West Orange in June 2021, waiting until late in the month so that the children could complete the school year in the New York City private schools in which they had been placed by the New York City Board of Education ("NYC Board"). *Id.* After the Parents advised the Board that the family would be moving to West Orange, the Board obtained and reviewed the students' records and conducted speech and occupational therapy evaluations of the children. *Id.* ¶ 3. The Board then proposed Individualized Educational Plans ("IEPs") for each student. *Id.* ¶¶ 6-9. As explained more fully below, this matter arises from the subsequent dispute over whether the IEPs proposed by the Board were comparable to those the students had prior to moving to New Jersey.

    i.  **G.R.**

G.R. was born on February 28, 2010. He is diagnosed with Social Language Delay and Attention Deficit Hyperactivity Disorder. ECF No. 11-6, Ex. B at 2. Accordingly, he has been placed in specialized school environments by the NYC Board from a young age. Def. SMF Supp. at ¶ 14. Prior to relocating to West Orange, G.R. attended the specialized private school The Parkside School ("Parkside") in New York City, having been placed there by the NYC Board through an Individualized Education Program (the "NYC IEP") dated March 11, 2021 that called for a NYS-approved non-public school with a classroom containing an 8:1+1 ratio.[3] *Id.* ¶ 15.

---

[2] Background facts are taken from the parties' statements of material fact, pursuant to Local Civil Rule 56.1. *See* ECF Nos. 11-3 ("Pl. SMF"), 13-5 ("Def. SMF Reply"), 13-6 ("Def. SMF Supp.").
[3] This ratio refers to eight students to one teacher with one paraprofessional.

Additionally, the NYC IEP called for other programs and services, including: (i) speech therapy via two thirty-minute sessions per week in a group no larger than three and one individual thirty-minute session per week; (ii) occupational therapy through one thirty-minute session per week in a group of two; and (iii) counseling via one thirty-minute group session and one thirty-minute individual session per week. Pl. SMF at ¶ 4. These programs and services were to be provided during July and August as part of the extended school year ("ESY") program. *Id.*

On June 4, 2021, having completed its evaluation of G.R., the West Orange Child Study Team found him to be eligible for special education and related services under the classification category of "Other Health Impaired." *Id.* ¶ 6. As part of the Board's IEP, G.R. was offered placement in mainstream classes in West Orange's middle school with an in-class resource for all subjects and was offered a 1:1 aide for thirty days to help acclimate G.R. to the new educational setting. *Id.* The Board also proposed weekly speech and occupational therapy sessions (in group settings) and counseling (once weekly in an individual setting and once in a group setting). *Id.* ¶ 8. For the ESY of Summer 2021, the Board proposed a Language and Learning Disabilities ("LLD") class for Language Arts and Math, as well as speech and occupational therapy in a small group, and individual counseling. *Id.*

### ii. B.R.

B.R. was born on March 14, 2008. He is diagnosed with Autism Spectrum Disorder and Executive Functioning Disorders. ECF No. 11-6, Ex. F at 2. Prior to moving to West Orange, B.R. attended Winston Preparatory School in New York City ("Winston Prep NYC") pursuant to the NYC IEP, which called for a NYS-approved non-public school with a classroom containing an 8:1+1 ratio. Def. SMF Supp. ¶ 2. Additionally, the NYC IEP called for the provision of other programs and services, including: (i) speech therapy via one forty-minute small group session per

week; (ii) occupational therapy via one forty-minute small group session per week; and (iii) counseling via one forty-minute small group session and one forty-minute individual session per week. Pl. SMF at ¶ 5. These programs and services were also to be provided during July and August as part of the ESY program. *Id.*

On June 4, 2021, after assessing B.R.'s records and performing an examination as they did with G.R., the West Orange Child Study Team found B.R. to be eligible for special education and related services. *Id.* ¶ 6. And like the Board's program for G.R., B.R.'s proposed IEP offered placement in mainstream classes in West Orange's middle school with an in-class resource for all subjects and a 1:1 aide for thirty days to help acclimate B.R. to the new educational setting. *Id.* The Board also proposed weekly speech therapy sessions, occupational therapy sessions, and counseling sessions, in both group and individual settings. *Id.* ¶ 9. For the ESY of Summer 2021, the Board proposed a LLD class for Language Arts and Math, as well as speech and occupational therapy in a small group, individual counseling, and a shared aide. *Id.*

### iii. Initial Dispute over IEPs

On June 7, 2021, counsel for the Parents sent a letter to counsel for the Board, advising that the Parents had concerns about class size, teacher attention, and school size in light of G.R.'s and B.R.'s learning needs, and, as a result, believed the proposed IEPs for both B.R. and G.R. were substantially different from their NYC IEPs. *Id.* ¶ 10; Def. SMF Reply ¶ 10. Accordingly, the Parents requested that the Board place both students at Winston Preparatory School in Whippany, NJ ("Winston Prep NJ") until the Parents could observe the Board's proposed program at the start of the next school year. *Id*. The Board denied this request on the same day, advising the Parents that it believed its proposed IEPs were comparable to their current programs, as required by law. *Id.*

### iv. Administrative Proceedings

On June 10, 2021, the Parents filed due process petitions and requests for emergent relief with the New Jersey Department of Education. Pl. SMF ¶12. The due process petitions—currently still pending and not at issue here—challenged the appropriateness of the IEPs offered to B.R. and G.R. by the Board. The requests for emergent relief before the ALJ—the subject of review in the instant matter—sought immediate placement of B.R. and G.R. at Winston Prep NJ during the pendency of the due process proceedings. *Id.* ¶¶ 13-14.

After oral argument concerning the requests for emergent relief, the ALJ issued final decisions on June 16, 2021 awarding G.R. and B.R. immediate placement at Winston Prep NJ at the Board's expense, pending the outcome of the due process petitions. *Id.* ¶¶ 16-19. The ALJ, relying on N.J.A.C. 6A:14-1.1(g)'s provision for student transfers from an out-of-state school district, explained that, in each student's case, the only issue was "whether or not the proposed IEP offered by [the Board] is comparable to the [student's] current IEP." ECF No. 11-6, Ex. B at 5 (the "G.R. Decision"); Ex. F. at 5 (the "B.R. Decision").

Accordingly, the ALJ found that the Board's proposed IEPs as to both G.R. and B.R. were not comparable to their NYC IEPs. With respect to G.R., the ALJ focused on the differences in class size and student population between G.R.'s placement at Parkside under the NYC IEP and the proposed IEP by the Board. The ALJ noted the eight-student class-size at Parkside (all of whom were classified as Special Education students), compared to classes of approximately twenty students in the 500-student middle school proposed by the Board's IEP. *See* G.R. Decision at 5-6. The ALJ made similar findings as to B.R., who, under the Board's proposed IEP, would go from Winston NYC with classes of eight classified students in a school of 236 to the mainstream middle school with classes of approximately twenty students and a total population of

5

approximately 500. *See* B.R. Decision at 5-6. Finding that the proposed IEP was therefore not comparable, the ALJ ordered that the students' new placement would be the Whippany, NJ campus of Winston Prep and they would be maintained there by the Board until the resolution of the due process petitions. *See* G.R. Decision at 6-7; B.R. Decision at 6-7.

### b. **Procedural Background**

Following the administrative proceedings, the Board initiated this action, pursuant to 20 U.S.C. § 1415(i)(2)(A) and New Jersey Administrative Code 6A:14-2.7(v) on July 20, 2021 seeking a review and reversal of the ALJ's June 16, 2021 decisions. ECF No. 1. After seeking a temporary restraining order and subsequently withdrawing its request (*see* ECF Nos. 3, 8), the Board brought this motion for summary judgment on October 8, 2021. ECF No. 11.

### III. **LEGAL STANDARD**

#### a. **Fed. R. Civ. P. 56**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *id.* (c) (requiring that assertions be supported by cites to the record, such as documents, depositions, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory responses, or other materials).

"A fact in dispute is material when it 'might affect the outcome of the suit under the governing law' and is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gonzalez v. Elizabeth Police Dep't*, No. 18-3765, 2021 WL 1399859, at *4 (D.N.J. Apr. 13, 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute about a material fact is "genuine" only if there is a sufficient evidentiary basis that would

allow a reasonable fact finder to return a verdict for the non-moving party. *Frisch v. Insperity Holdings, Inc.*, No. 15-840, 2017 WL 3816535, at *1 (D.N.J. Aug. 31, 2017) (citations omitted). In deciding a motion for summary judgment, the Court must view the evidence presented in the light most favorable to the non-moving party. *Id.* The moving party has the initial burden of establishing that no genuine issue of material fact remains. *Sanders v. Jersey City*, No. 18-01057, 2021 WL 1589464, at *5 (D.N.J. Apr. 23, 2021) (citations omitted). If the moving party meets its threshold burden, "the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial." *Stukes v. Cohen*, No. 17-2225, 2020 WL 4345309, at *2 (D.N.J. July 29, 2020) (citing *Anderson*, 477 U.S. at 248). "Unsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Id.* (citations omitted).

    b. **IDEA**

The IDEA requires states receiving federal education funding to ensure that students with disabilities receive a free appropriate public education ("FAPE") through the implementation of IEPs. *M.C.I. v. N. Hunterdon-Voorhees Reg'l High Sch. Bd. of Educ.*, No. 17-1887, 2018 WL 902265, at *1 (D.N.J. Feb. 15, 2018) (citing 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)); *see also C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010) (a student's IEP must address their "level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress")

Under the IDEA, any party aggrieved by the findings of an administrative decision may seek review of the decision by a district court. 20 U.S.C. § 1415(i)(2). The reviewing court shall receive the administrative record and base its decisions upon "the preponderance of the evidence," granting "such relief as the court determines appropriate." 20 U.S.C. § 1415(i)(2)(C). The party

7

"challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir.2012).

When reviewing an ALJ's determination under the IDEA, the district court applies "a modified version of de novo review." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013). This standard requires the court to "give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.,* 435 F.3d 384, 389 (3d Cir.2006); *S.H. v. State–Operated Sch. Dist. of Newark,* 336 F.3d 260, 271 (3d Cir.2003) ("[F]actual findings from the administrative proceedings are to be considered prima facie correct."). Under the "due weight" standard, the Court is required "to consider—although not necessarily to accept—the administrative fact findings." *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 529 (3d Cir.1995). Importantly, if the Court departs from the ALJ's findings, it must find factual support in the record and "fully explain [ ] its reasons for departing from the state decision." *S.H.,* 336 F.3d at 270–71. The ALJ's legal determinations, however, are reviewed de novo. *See, e.g., P.N. v. Greco,* 282 F.Supp.2d 221, 235 (D.N.J. 2003).

The IDEA's requirement that district courts grant judgment based on their own ascertainment of the preponderance of the evidence—while giving "due weight" to the ALJ's factual findings—means that "many IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of material fact.'" *D.B. ex rel. H.B. v. Gloucester Tp. Sch. Dist.*, 751 F. Supp. 2d 764, 769 (D.N.J. 2010), *aff'd*, 489 F. App'x 564 (3d Cir. 2012) (citation omitted). Accordingly, "[a]lthough seeking judicial review of an administrative agency's decision by way of a summary judgment motion 'is permissible under the IDEA, it is not a true summary judgment procedure." *Id.* (citation omitted). Instead, the parties are "effectively seeking a judgment on the administrative agency's record." *Id.*

8

**IV.   DISCUSSION**

The Board's principal argument as to why the ALJ's decision warrants reversal is that the ALJ erred when he determined that the Board's proposed programs for G.R. and B.R. were not comparable to those set forth in their NYC IEPs.[4]  Specifically, the Board argues that its proposal for each student of "a smaller education setting" with "access to the general education curriculum," paired with speech, counseling, and occupational therapy services was comparable to the programs provided by the students' previous IEP. Pl. Br. at 21, 22.  Additionally, the Board argues that the ALJ erred in elevating physical location over educational services.  In response, the Parents argue that the ALJ did not err because he recognized that the Board's proposed program did not properly account for the small class size, low student-teacher ratio, and specialized environment required by the students' NYC IEPs.  For the reasons discussed below, the Court finds that the ALJ's conclusion that the Board's plans for G.R. and B.R. were not comparable to their previous plans was indeed correct.

The IDEA and New Jersey's state law analogue require a school district, upon the transfer of a student with a disability from an out-of-state school district, to "provide a program comparable to that set forth in the student's current IEP." N.J.A.C. 6A:14-4.1(g); *see also* 20 U.S.C. § 1414(d)(2)(C)(i)(II).  The crux of the issue, as the ALJ properly identified, is thus the comparability of the programs. See G.R. Decision at 5 ("The only issue herein is whether or not the proposed IEP offered by Respondent is comparable to the current IEP being implemented ….").  In 71 Fed. Reg. 46540, the Office of Special Education Programs of the Department of

---

[4] In anticipation of an argument by the Parents on administrative exhaustion, the Board also argued it had exhausted its administrative remedies and, in the alternative, that administrative exhaustion was not required in light of the legal issues at stake and the futility of exhaustion.  *See* Pl. Br. 7-11.  The Parents, however, expressly disavowed a challenge on exhaustion.  *See* Def. Br. at 33.  Consequently, the Court need not address the Board's argument on this issue.

Education ("OSEP") explained that "the Department interprets 'comparable' to have the plain meaning of the word, which is 'similar' or 'equivalent.'" *Id.* at 46681. Accordingly, this Court asks whether the programs proposed by the Board were "similar" or "equivalent" to those provided by the students' previous IEPs. Because evaluations of an IEP are typically questions of fact, *see P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009), and there is no statutory standard for such evaluations, *see Timothy F. v. Antietam Sch. Dist.*, No. 12-2719, 2014 WL 1301955, at *4 (E.D. Pa. Mar. 31, 2014), the Court must afford "due weight" to the ALJ's consideration of whether the programs were comparable, *Ramsey Bd. of Educ.*, 435 F.3d at 389.

### a. G.R.

Turning first to G.R.'s IEPs, the Board asserts that the factual record shows its IEP was "almost identical" to his NYC IEP, pointing to the proposed "smaller educational setting," an in-class resource setting for all subjects, a 1:1 aide, placement in an LLD class for Language Arts and Math in the summer, along with speech, occupational therapy, and counseling sessions. Pl. Br. at 22-23. While there may be some differences between the frequency and group size of the speech, occupational therapy, and counseling sessions offered by the two programs, the Board is correct that these provisions are more or less equivalent. However, the "smaller educational setting" the Board offers is far from "almost identical" to that found in the NYC IEP. The Board's proposal would place B.R. in a mainstream classroom consisting of approximately twenty students, compared to the 8:1+1 ratio called for in the NYC IEP and the "classes with eight other students, all of which are classified" that he was accustomed to at Parkside. G.R. Decision at 5. Further, West Orange's middle school contains approximately 500 students in grades five through eight, compared to the approximately 80 in K-5 at his placement under the NYC IEP. And courts have

indeed noted the importance of class size and student-teacher ratios in evaluating IEPs. *See T.R. v. Kingwood Tp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (class size); *W.R. v. Union Beach Bd. of Educ.*, No. 09-2268, 2009 WL 4042715, at *5 (D.N.J. Nov. 19, 2009) (student-teacher ratio); *see also S.H. v. Fairfax Cnty. Bd. of Educ.,* 875 F. Supp. 2d 633, 665 (E.D. Va. 2012) ("The Court, however, agrees with the Hearing Officer's determination that comparing class sizes is directly relevant."). The Court thus finds nothing in the record to call into question the ALJ's finding, and, moreover, agrees that the significant differences in class size, school size, student-teacher ratio, and the proportion of classified students per class indicate the plans were not equivalent. That certain elements of the plans—namely the speech, occupational therapy and counseling components—were similar does not mitigate these other substantial differences, which were essential components of the NYC IEP and B.R.'s educational needs. *See* ECF No. 11-5, Ex. C, at 10-11 (identifying "maximum student-to-staff ratio" of 8:1+1); ECF No. 13-4, Ex. P, Neuropsychological Evaluation by Dr. C. Cuddy at 9 ("[G.R.] needs not only a small classroom environment but a small school environment with continuous teacher support . . . set up for children with similar issues, with occupational and speech supportive services that can be fully integrated in the classroom throughout the day."); ECF No. 13-4, Ex. O, Ltr. from M. Murashima, at 2 ("It is strongly recommended that he will be placed in a small school environment with a small classroom size with the student-teacher ratio of 8:1:1 where he can be provided with the support he requires in order to progress.").[5]

Moreover, the Board's reliance on *Y.B. o/b/o S.B. v. Howell Township Bd. of Edu.*, 4 F.4th 196 (3d Cir. 2021), in support of its argument that the relevant plans were comparable, is

---

[5] Dr. Cuddy's evaluation and Ms. Murashima's letter were considered by the ALJ as Petitioners' Exhibits B and D, respectively. *See* G.R. Decision at 8.

misplaced. *See* Pl. Br. at 17-21; Pl. Reply at 9-11. In *Howell*, the record did not include any evidence or arguments about class size, student-teacher ratio, school size, or student population. *Howell,* 4 F.4th at 200-01. And the panel noted only that "*[o]n the record before us*, we cannot say the services were not comparable." *Id.* at 200 (emphasis added). Further, because findings of the ALJ must be afforded "due weight," *see Ramsey Bd. of Educ.,* 435 F.3d at 389, it is notable that the *Howell* court was presented with a record in which the ALJ had already found the two plans at issue were in fact comparable. *Howell,* 4 F.4th at 197. By contrast, the ALJ here expressly found that the record indicated "these programs are substantially different and not comparable" because of additional factors not presented in *Howell*, including that "[c]lass size and student population are quite different." G.R. Decision at 6. Accordingly, the relevant considerations relied upon by the ALJ are quite different—and far more substantial—than those presented in *Howell*.

Next, the Board argues that the ALJ did not analyze the specific services and supports it offered G.R. Pl. Br. at 25. However, as the Board points out, the ALJ indeed recognized that "both IEPs offer similar types of programs." *Id.* at 24; G.R. Decision at 6. Of course, to reach this conclusion, the ALJ necessarily had to analyze these services. Yet, the ALJ not only analyzed them, he determined that other differences outweighed these similarities. The ALJ keyed in on the basis for his decision—contrasting these initial similarities with the stark differences in class size and student population. G.R. Decision at 6. Therefore, the ALJ properly weighed the similarity of certain services—including speech and occupational therapy and counseling—against the substantial difference of other components of the programs, and ultimately found that, on balance, they were not comparable. As explained above, this Court, in its own examination of the record, agrees that the substantial differences in class size, school size, student-teacher ratio, and

student population require the conclusion that the programs were not equivalent. Accordingly, the Court rejects the Board's argument as to G.R.

### b. B.R.

Turning now to B.R.'s IEPs, the Court notes the arguments put forward by the Board and the Parents, as well as the decision of the ALJ, are nearly the same as those in G.R.'s case. To start, the Board leads with an argument that its program for B.R.—like its program for G.R.—was "almost identical" to his NYC IEP and thus comparable, citing the same considerations as it offered in G.R.'s case, namely a smaller educational setting, an in-class resource setting for all subjects, a 1:1 aide, placement in an ESY LLD class for Language Arts and Math, along with speech, occupational therapy, and counseling sessions. Pl. Br. at 21. Focusing on these issues, the Board fails to adequately address the Parents' principal contentions regarding class size, student-teacher ratio and teacher attention. Similarly, the Board argues the ALJ did not sufficiently analyze the services offered to B.R. For the reasons discussed in G.R.'s case, the Court finds the Board's argument as to B.R. similarly lacks merit.

The Board advances another argument, however, that requires additional discussion. The Board argues that, with respect to B.R., the ALJ erred by limiting his analysis to the physical location of the programs. Pl. Br. 24-28. The Board points to two parts of the ALJ's decision in support of this argument. First is the ALJ's finding that "[w]hile both IEPs offer similar types of programs, the actual setting for the delivery of those programs are substantially different and not comparable." B.R. Decision at 6. And second is the ALJ's assessment that "it would be more prudent" to place B.R. at the Whippany, NJ campus of Winston Prep, which would continue the program he received at Winston Prep NYC. *Id.* Essentially, the Board argues that by focusing on

the "setting" the ALJ ignored whether the proposed programs were comparable and instead embraced a "legal standard . . . of comparing campuses." Pl. Br. 27.

As an initial matter, the ALJ's acknowledgment of similar types of programs in the two plans belies any claim that the ALJ ignored those services altogether. More importantly, however, the record here indicates the "setting" to which the ALJ referred encompasses far more than just location. The Board's own brief, in attempting to demonstrate the comparability of the programs, points to the "smaller educational setting" that it was offering. Pl. Br. at 21. The Board thus recognizes itself that "setting" refers to other factors besides simply location. Here, as underscored by the submissions of B.R.'s psychologist, it encompassed class size, school size, student-teacher ratio, teacher attention, and student population, among other factors. *See, e.g.,* ECF No. 13-4, Ex. G., Neuropsychological Evaluation of Dr. M. Fiorino-Grafman, at 30-31 (recommending a "specialized learning environment" and "small school environment, [where] teachers and support staff work in tandem with one another facilitating communication throughout the day . . . [because B.R.] takes his learning and developmental disabilities to all his classes, not just some.").[6] As discussed above, these factors—all components of the educational setting—are validly considered in determining whether the plans were comparable, and these factors clearly support the ALJ's conclusion that the plans were not. Indeed, the ALJ's decision to place B.R. at the New Jersey campus of Winston Prep came only after his determination that the Board's proposed program was not comparable to his current IEP. *See* B.R. Decision at 6. The ALJ was not simply "comparing campuses," as the Board contends, Pl. Br. at 27, but comparing the factors that constitute the educational setting, including class size, school size, and student-teacher ratio, among others.

---

[6] This evaluation was also considered by the ALJ as Petitioners' Exhibit B. *See* B.R. Decision at 8.

Accordingly, the ALJ did not limit his analysis to the physical location of the programs; he compared the programs in their entirety and reached the correct conclusion that they were not comparable.

Finally, to the extent the Board argues that the ALJ's decision is inconsistent with *Howell*, this argument lacks merit. Pl. Reply at 11. As *Howell* explains, when a student with a disability transfers into a new school district, the proper analysis is whether the receiving district provided services comparable to the previous IEP.[7] *Howell*, 4 F.4th at 199. Indeed, the ALJ engaged in this exact analysis. *See* B.R. Decision at 5 ("The only issue herein is whether or not the proposed IEP offered by Respondent is comparable to the current IEP being implemented."); *see also id.* (quoting in full N.J.A.C 6A:14-1.1(g)'s requirement that a new school district provide "a program comparable to that set forth in the student's current IEP"). Accordingly, the ALJ's determination that the case hinged on the comparability of the Board's plans with the students' current plans was consistent with *Howell*.

Therefore, this Court finds, on its own examination of the record and affording due weight to the ALJ's findings, that the differences between the proposed and current programs in terms of class size, student-teacher ratio, the proportion of classified students per class, and school size indicate the plans were not equivalent.

---

[7] *Howell* addressed the intrastate transfer provision of the IDEA, but the panel's analysis would apply to the interstate transfer provision as well, since the two provisions are nearly identical. For a transferring student "who had an IEP that was in effect *in the same state*," the intrastate transfer provision requires "the local educational agency [to] provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP…." 20 U.S.C. § 1414(d)(2)(C)(i)(I) (emphasis added). Similarly, for a transferring student "who had an IEP that was in effect in *another State*," the interstate transfer provision also requires "the local educational agency [to] provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP…." 20 U.S.C. § 1414(d)(2)(C)(i)(II) (emphasis added).

## V.     CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is denied. An appropriate Order accompanies this Opinion.

**DATED:**  July 22, 2022

<i>s/ Claire C. Cecchi</i><br>
<b>CLAIRE C. CECCHI, U.S.D.J.</b>